932 A.2d 1186

ANDERSON ADVENTURES, LLC

v.

SAM & MURPHY, INC., t/a Fins.

No. 1343, Sept. Term, 2006.

Court of Special Appeals of Maryland.

Sept. 21, 2007.

Daniel J. Mellin (on the brief) of Annapolis, for appellant.

William Zifchak (Thomas McManus, Simon Kann, Jerome Feldman, on the brief) of Upper Marlboro, and Annapolis, for appellee.

Argued before HOLLANDER, BARBERA and KARWACKI (Retired, Specially Assigned), JJ.

BARBERA, J.

The dispute in this appeal stems from the sale and purchase of a restaurant, Fins, located at 1629 Crofton Center in Crofton, Maryland. In 2005, Anderson Adventures, LLC ("Anderson Adventures"), appellant, agreed to purchase the restaurant from Sam & Murphy, Inc. ("Sam & Murphy"), appellee. It was further agreed that closing would not occur until the liquor license for the restaurant could be transferred to appellant, and until then, the restaurant would be managed by Eric Anderson, the managing member of appellant. Two documents governed the transaction: a Restaurant Management Agreement and an Asset Purchase Agreement and Receipt.

At closing, appellant refused to pay appellee the full purchase price set forth in the Asset Purchase Agreement and Receipt. Appellant argued that it was entitled under the terms of the Asset Purchase Agreement and Receipt to withhold from payment nearly $40,000.00 to cover, *inter alia,* various repairs that appellant had made to equipment in the restaurant and gift certificates issued by appellee, which appellant redeemed.

Appellant thereafter petitioned the Circuit Court for Anne Arundel County "To Assume Jurisdiction and for Appointment of a Receiver for an Insolvent Corporation under the Bulk Sales Act." The court entered an order declaring appellee in receivership and appointed a Receiver.

The court later issued an Order authorizing appellant to pay approximately $10,000.00 into the court registry pending further proceedings in the receivership. Those funds represented the net proceeds of the sale. The Order recited that the receivership was subject to appellee's contention that the net proceeds of sale were closer to $50,000.00, and that appellant had wrongly withheld that amount at closing.

Appellee filed a counter-petition asking the court to order appellant to pay into the court registry the additional sum that appellant had withheld at closing. The court conducted a two-day hearing on the counter-petition. The court determined that appellant was responsible for the majority of all restaurant-related repairs incurred after appellant took possession of the restaurant in June 2005. The court ruled that of the nearly $40,000.00 that appellant withheld at closing, approximately $28,499.80 of that was wrongly withheld. The court thereafter issued an Order directing appellant to pay that sum into the court registry, to be distributed by the Receiver pursuant to the Bulk Transfers Act. *See* Md.Code (1975, 2002 Repl.Vol.), §§ 6–101 *et seq.* of the Commercial Law Article ("CL").

Appellant timely appealed. Appellant presents the following questions for our review, which we have rearranged and reworded slightly:

1. Did the court commit reversible error in construing an "as is" provision in the Management Agreement to control over express warranties in the Asset Purchase Agreement and Receipt?

2. Did the court commit reversible error in finding that gift certificates issued by Sam & Murphy and redeemed after June 26, 2005 were not Sam & Murphy's accounts payable that remained the responsibility of Sam & Murphy?

For reasons we shall explain, we hold that the court erred in finding that appellant purchased the restaurant "as is" and was responsible for restaurant-related repairs incurred after appellant took possession of the restaurant, but before closing on the sale of the restaurant. We further hold that the gift certificates issued by appellee before appellant took over management of the restaurant, and later redeemed to appellant, remained appellee's obligation. The court erred in ruling to the contrary. We therefore shall vacate the judgment and remand for further proceedings.

## FACTS

On April 18, 2005, Eric Anderson, the managing member of appellant, wrote a letter of intent to Samuel Chaney, President of Sam & Murphy, outlining appellant's intent to purchase Fins. The letter set forth the terms of the proposed acquisition of the restaurant. The letter provided that appellant "will acquire all of the tangible and intangible assets listed on the balance sheet at the time of closing[,]" and it indicated that the total purchase price for the proposed acquisition would be $150,000.00. The letter further stated:

In lieu of a deposit, [appellant] will provide [appellee] a short term interest free loan of $35,000.00 until closing.[1] This money will be used by [appellee] to pay the State Liquor Board to continue the current license, and the amount will be applied toward the purchase price. The

---

1. In the letter, $35,000.00 is crossed out, and $35,250.00 is handwritten on the page.

balance is due at closing. The form of Security to secure this loan shall be acceptable to [appellant].

The letter of intent indicated that appellant's purchase of the restaurant was expressly contingent upon the occurrence of nine events, including, *inter alia,* the business's conformity to all appropriate codes and regulations, and the transfer of all appropriate licenses (liquor, health, business, fire, etc.) to appellant. Moreover, the sale was contingent upon appellant's inspection and acceptance of all leasehold improvements, including the kitchen equipment and equipment warranties and maintenance agreements.

The letter of intent indicated that the closing of the transaction would "take place as promptly as possible after May 8, 2005 but in no event later than May 31, 2005." Samuel Chaney signed the letter, indicating that he had read it and agreed to it as written.

Closing did not occur in May. On June 22, 2005, the parties entered into an "Asset Purchase Agreement and Receipt" ("Asset Purchase Agreement"). Attached to the Asset Purchase Agreement was the April 2005 letter of intent and a "Restaurant Management Agreement" ("Management Agreement"). The Management Agreement was entered into by appellee and Eric A. Anderson, Individually.

Pursuant to that agreement, Eric Anderson took over management of the restaurant under appellee's liquor license, on June 27, 2005. The Management Agreement recited that it would "end on the later of September 30, 2005 or the date that the liquor license is transferred to the Manager."

In the Asset Purchase Agreement, appellant agreed to purchase Fins from appellee for the sum of $150,000.00. The agreement provides:

The purchase price shall be the sum of $150,000.00, payable as follows:

$ 35,250.00 By holding satisfied, the short term loan to [appellee] dated April 20, 2005 with affiliated Chattel Security Agreement and

$114,750.00 By a cashier's check payable to escrow agent at Closing.

Paragraph two of the Asset Purchase Agreement provides:

If, after all conditions of the Letter of Intent/Management Agreement have been met by [appellee], to the satisfaction of [appellant], and [appellant] fails to pay the balance of cash necessary to close this sale and to complete the purchase as herein provided within five (5) days following a written demand to do so, [appellee] shall have the right to enforce this contract by any legal or equitable remedies including, without limitation, by suit for specific performance or by an action for damages for [appellant's] breach of contract in which [appellee] shall be entitled, without limitation, to recovery of [appellee's] loss of bargain, to [appellee's] consequential damages, and to its liability for Broker's commissions[.]

The agreement further provides that the closing date for the sale "shall be on a date which is the later of September 30, 2005 or within fifteen (15) days after the premises lease and liquor license is transferred to Buyer."

Paragraph four of the Asset Purchase Agreement recites appellant's acknowledgment that it had examined all elements of the business. That paragraph provides:

By proceeding with closing, [appellant] hereby acknowledges and represents that [appellant] has personally and thoroughly investigated all elements and constituents of the business to be sold hereunder including, without limitation, all heating, cooling, plumbing and electrical systems, the utility services available to the premises, all improvements, fixtures, equipment and appliances situated in or in connection with the premises, as well as all assets and rights included in this sale[.] ... [Appellant] further acknowledges that [appellant] has examined [appellee's] books and records, that [appellant] is fully aware of possible risks, if there are any, with respect to the business, has formed its own judgment as [to] the worth and potential of the business and assets hereunder, and that [appellant] is relying upon its own judgment and decision in making this offer and

in entering into and consummating the purchase and sale of the business and assets hereunder.

The parties attached a Schedule of Conditions to the Asset Purchase Agreement, which was "made and constitute[d]" a part of the agreement. Paragraph six of the Schedule of Conditions provides:

**Condition of Equipment.** All equipment documented in Exhibit "A" attached hereto and by reference incorporated herein is being purchased on an "as is" basis without warranty of merchantability of fitness for any particular purpose; however, at the Closing of this sale, all equipment shall be in working condition and shall comply with all applicable codes and regulations, and [appellee], at its sole expense, shall repair or replace any equipment not in said working condition.

Paragraph ten of the Schedule of Conditions reads:

**Accounts Receivable and Payable.** Any and all accounts receivable and payable accruing to and existing as of close of business June 26, 2005, are and shall remain the sole property of [appellee] and responsibility of [appellee] and are not included as a part of this transaction. Any and all accounts receivable and payable, which shall accrue immediately from and after the Closing, shall become the sole responsibility of [appellant]. Any and all accounts receivable and payable accruing to and existing between June 27, 2005 and the closing are and shall remain the sole responsibility of [appellant] and are not included as a part of this transaction.

Paragraph eleven of the Schedule of Conditions states:

**Warranty.** [Appellee] represents and warrants that all outstanding liabilities of the Business shall be paid in full either before Closing or with the proceeds of the sale. [Appellant] shall receive possession and control of the Business free and clear of any liens or other encumbrances, except for the security interest granted [appellee] hereunder.

Paragraph twenty of the Schedule of Conditions provides:

**Business Premises.** Until possession is given, [appellee] agrees to maintain the Business premises, including heating,

cooling, plumbing, and electrical systems, built-in fixtures, together with all other equipment and assets included in this sale, in working order and to maintain and leave the premises in a clean, orderly condition and in conformance with all applicable codes, regulations, ordinances, etc. [Appellee] agrees to finish the "Sushi Bar" currently under construction.[2]

All finishes to be consistent with that in the rest of the restaurant. This new Work to be completed prior to contract closing.

As mentioned, on the day the parties entered into the Asset Purchase Agreement, appellee also entered into a Management Agreement with Eric Anderson. The Management Agreement provides, in part:

1. **TERM OF AGREEMENT.** This Agreement shall begin June 27, 2005, and end on the later of [] September 30, 2005 or the date that the liquor license is transferred to the Manager [meaning, Eric Anderson]. The term of this Agreement may be extended from month to month by Agreement of the parties.

\* \* \*

3. **DESCRIPTION OF PROPERTY.** Attached hereto as Exhibit A is the Asset Purchase Agreement between Owner [meaning, Sam & Murphy] and Manager. This Management Agreement shall cover all of the property and assets as set forth in the attached Assets Purchase Agreement. Manager has had an opportunity to inspect the premises and is accepting the premises on an "as is" basis.

\* \* \*

6. **OFFICE AND OPERATING EQUIPMENT.**

---

2. By inserting handwritten edits, the parties removed from this sentence a clause reading: "and to increase the Bar area by relocating the bar/dining room wall approximately five (5) feet."

6.1. Owner shall provide Manager with all existing equipment, tables, chairs, decorations, silverware, plates, glasses, furnishings, wall-to-wall carpet, dishwashers, refrigerators, freezers, cooking equipment and utensils, and all other things necessary for the full and complete operation of said restaurant []. Manager shall be responsible for the replacement of any and all Assets which are destroyed, damaged or lost by Manager during this Agreement. Attached hereto as Exhibit B is a list of all equipment to be utilized by Manager during the term of this Agreement.

6.2. Owner represents that there is sufficient equipment in order to operate or manage the restaurant. Any Assets purchased by Manager is owned by Manager and can be removed by Manager provided repairs are made to the property by Manager as a result of the removal of the Assets and the removal will not interrupt or disturb the regular course of business by said removal.

\* \* \*

## 12. UTILITIES AND REPAIRS.

12.1. Manager will be responsible for the reasonable and proper care of the Restaurant premises furnished by Owner and shall return same in the same condition as existed on June 27, 2005, normal wear and tear excepted. Manager will be responsible for payment of utility charges, rent, all alcoholic beverage fees for the renewal of the license and all other expenses in connection with the restaurant premises.

12.2. Manager shall also be responsible for all maintenance of the electrical, mechanical and plumbing systems in the restaurant premises and for any repairs necessitated by the operation of the restaurant.

\* \* \*

## 36. REPRESENTATIONS OF MANAGER. Manager has the experience and financial ability to manage the restaurant and make the payments, has inspected the prop-

erty and is willing to take the property in its present AS IS condition subject to all rules, regulations, and restrictions.

Manager has inspected, or has had the opportunity to inspect the books and records of Owner and is aware of the income attributed to the premises. Knowing all of that and after full inspection, Manager agrees to go forward with the managing of the property subject to the terms and conditions of this Agreement.

Five days later, on June 27, 2005, appellant took over possession, management, and operation of Fins. Shortly thereafter, appellant made various repairs to the restaurant, including repairs to the restaurant's raised seating area and to the structure's heating, ventilation, and air conditioning system. Appellant paid for the repairs and did not seek contribution from appellee at the time the repairs were made.

During the summer and fall of 2005, after appellant had taken over the management of the restaurant, customers at the restaurant redeemed $3,951.91 in gift certificates that were issued by appellee before June 27, 2005. On September 27, 2005, appellant sent a letter to Samuel Chaney requesting him to provide "a detailed, accurate accounting of gift certificates sold, indicating date sold, the denomination of the certificate, and the current status of the certificate, i.e. redeemed or outstanding." The letter further indicated that in the event the requested information was not received in time to conduct a proper audit before closing, then "monies in sufficient amount to ensure these certificates [would] not be a liability to Anderson Adventures, LLC [would] be deducted from the sale price and set aside in an escrow account held by the closing attorney."

Three weeks later, Eric Anderson sent a letter to Samuel Chaney and attached reports by the Maryland Department of Health and Mental Hygiene. In the letter, Eric Anderson wrote that the reports indicate "several conditions that must be corrected[.]" Eric Anderson informed Samuel Chaney that "[a]ny and all costs incurred in order to bring these conditions

into code compliance will be reduced from the selling price of the business."

On November 7, 2005, the parties closed on the sale of the restaurant. At that time, appellant declined to tender the full purchase price of the restaurant. Appellant contended that it was entitled to withhold $39,993.38, for repairs to the restaurant, replacement of equipment, redemption of gift certificates, and related expenses incurred since Eric Anderson over management of Fins on June 27, 2005. Although the parties disagreed about whether appellant was entitled to withhold funds, they proceeded with closing in order to protect the restaurant's lease and liquor license.

On November 16, 2005, appellant filed a petition for the appointment of a receiver for an insolvent corporation under the Bulk Transfers Act.[3] Appellant alleged that pursuant to the Asset Purchase Agreement the purchase price for the business "had to be adjusted for the conditions of transfer of the liquor license and lease, which included payment of [appellee's] back taxes and [appellee's] back rents." Appellant stated that the approximate balance of the purchase price was $50,000.00; it "held back $40,000.00 for additional adjustments to the Purchase Price"; and the remaining $10,000.00 due on the purchase price "will be paid in to Court in connection with this Petition for Receivership[.]" Appellant represented that the "Seller [appellee] has objected to the Purchaser's [appellant's] set off claims of $50,000.00 and Seller will be filing a counter-petition and motion asking the Court to order Purchaser to pay $40,000.00 in to Court as well."

Appellant claimed in the petition that the total amount of appellee's unsecured debt is $87,503.20. Appellant sought the

---

**3.** The Bulk Transfers Act applies to "any transfer in bulk and not in the ordinary course of the transferor's business of a major part of the materials, supplies, merchandise or other inventory [] of an enterprise subject to this title." CL § 6–102. The "Bulk Transfers" Act exists "to protect creditors against dishonest debtors surreptitiously selling their assets to bona fide purchasers and vanishing with the proceeds." *Chromacolour Labs, Inc. v. Snider Bros. Prop. Mgt., Inc.,* 66 Md.App. 320, 325, 503 A.2d 1365 (1986).

appointment of a receiver to receive funds from the bulk transfer and to pay claims as they are approved by the court. Appellant further requested the court to determine the nature and priority of the claims of appellee's creditors.

On December 6, 2005, appellant filed a motion to pay funds into the court and attached to the motion a check in the amount of $10,264.75, payable to the Clerk of the Circuit Court for Anne Arundel County. Two days later, the court docketed an order appointing Richard R. Trunnell, Esq., as receiver. Upon the parties' request, the court later substituted Jerome Feldman, Esq., as receiver.

Appellee filed the counter-petition for appointment of receiver and contended that appellant should be made to deposit a total of $50,000.00 into the court registry, reflecting not only the $10,000.00 that appellant already had deposited but also the additional $40,000.00 that appellant had withheld at settlement.

On June 16, 2006, the counter-petition came on for a two-day hearing. After hearing testimony from various witnesses and reviewing numerous exhibits, the court issued an oral ruling. The court ruled that the Asset Purchase Agreement and the Management Agreement must be read in conjunction and that, together, the agreements create an ambiguity concerning which party was responsible for the payment of repairs made to the restaurant's structure and equipment after June 27, 2005. The court stated that it did not know who drafted the agreements and it therefore could not hold the ambiguities against the drafter. Shortly after the court gave its ruling, Eric Anderson stated that he was the drafter of the Management Agreement. The court stated that it would incorporate into its ruling that Eric Anderson was the drafter of the agreement and "hold the ambiguity against him."

Based on the evidence that it had reviewed, including parol evidence, the court determined that there "was the sale of the restaurant, and . . . the effective date of the transfer was June 27, 2005." The court further determined that the sale of the

restaurant was "as is" and that appellant had purchased the restaurant "lock, stock and barrel." The court concluded that appellant was responsible for almost all expenses paid after June 27, 2005. The court reasoned that appellant was not permitted to withhold $5,000.00 towards the purchase price of the restaurant to account for gift certificates issued by appellee but redeemed to appellant. The court determined that paragraph ten of the Schedule of Conditions indicated that appellant was responsible for the restaurant's accounts receivable and payable accruing after June 27, 2005, including the gift certificates that appellee issued. By that ruling, the court rejected appellant's claim that the certificates became accounts payable that accrued upon issuance and were therefore the obligation of appellee.

As mentioned, appellant withheld $39,933.38 from the purchase price of the property at settlement. In its oral ruling, the court determined that appellant properly withheld only $13,194.18 for various expenses it had incurred before closing.

Appellant thereafter filed a motion for reconsideration, which the court denied. Appellant noted this timely appeal.

## DISCUSSION

### I.

Appellant contends that the court, in deciding whether appellant was entitled to withhold $39,993.38 from the purchase price of the restaurant, erroneously relied upon the "as is" provision in paragraph three of the Management Agreement. Appellant maintains that the Management Agreement does not address at all the purchase or sale of restaurant assets; rather, it relates only to the management of the restaurant from June 27, 2005 (the date Eric Anderson began managing the restaurant), until closing in November 2005. Appellant argues that the court failed to give proper attention to express warranties that appellee made in paragraph six of the Asset Purchase Agreement, which controls the purchase and sale of the assets.

▆▆▆▆▆▆▆▆▆▆

Appellee responds that the court did not err in finding that appellant purchased the restaurant on an "as-is" basis and therefore was responsible for all repairs in the restaurant that took place after June 27, 2005, when, in appellee's words, appellant "took control of the restaurant." Appellee contends that the court properly read the Management Agreement and the Asset Purchase Agreement in conjunction with each other and that the agreements, read together, create an ambiguity about who was responsible for repairs. Appellee further maintains that the ambiguities were properly construed against appellant, as the drafter of the Management Agreement.

▆▆▆▆▆ "Maryland adheres to the principle of the objective interpretation of contracts." *Cochran v. Norkunas,* 398 Md. 1, 16, 919 A.2d 700 (2007). The court " 'giv[es] effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean.' " *United Servs. Auto. Ass'n v. Riley,* 393 Md. 55, 79, 899 A.2d 819 (2006) (quoting *Towson Univ. v. Conte,* 384 Md. 68, 78, 862 A.2d 941 (2004)). "Words are to be given their ordinary meaning[.]" *Auction and Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 343, 731 A.2d 441 (1999) (citation and internal quotation marks omitted). If the language of a contract is unambiguous, the court "do[es] not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Cochran,* 398 Md. at 16, 919 A.2d 700. Rather, the " 'court must presume that the parties meant what they expressed.' " *United Services,* 393 Md. at 80, 899 A.2d 819 (quoting *Towson Univ.,* 384 Md. at 78, 862 A.2d 941).

▆▆▆▆▆ "Ambiguity arises if, to a reasonable person, the language used is susceptible of more than one meaning or is of doubtful meaning." *Cochran,* 398 Md. at 17, 919 A.2d 700. "To determine whether a contract is susceptible of more than one meaning, the court considers 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution.' " *Phoenix Servs. Ltd.*

*P'ship v. Johns Hopkins Hosp.,* 167 Md.App. 327, 392, 892 A.2d 1185 (2006) (quoting *Pacific Indem. Co. v. Interstate Fire & Cas. Co.,* 302 Md. 383, 388, 488 A.2d 486 (1985)). "A contract is not ambiguous merely because the parties do not agree as to its meaning." *Maslow v. Vanguri,* 168 Md.App. 298, 319, 896 A.2d 408 (2006).

 "If a trial court finds that a contract is ambiguous, it may receive parol evidence to clarify the meaning." *Id.* Moreover, "where an ambiguity exists in a contract, the ambiguity is 'resolved against the party who made it or caused it to be made, because that party had the better opportunity to understand and explain his meaning.'" *L & H Enters., Inc. v. Allied Bldg. Products Corp.,* 88 Md.App. 642, 650, 596 A.2d 672 (1991) (quoting *King v. Bankerd,* 303 Md. 98, 106, 492 A.2d 608 (1985)). "Contract interpretation, including the determination of the ambiguity of a contract, is a question of law and subject to *de novo* review." *United Services,* 393 Md. at 79, 899 A.2d 819.

The Management Agreement, by its terms, governs the relationship between Eric Anderson and appellee before closing of the sale of the restaurant to appellant. The agreement clearly indicates that Eric Anderson agreed to manage Fins beginning on June 27, 2005. Appellee represented in the agreement that there was "sufficient equipment in order to operate or manage the restaurant." Eric Anderson, for his part, represented that he had "inspected the property and [wa]s willing to take the property in its present AS IS condition subject to all rules, regulations, and restrictions."

Eric Anderson further agreed in the Management Agreement to "be responsible for the reasonable and proper care of the Restaurant premises furnished by [appellee]" and to "be responsible for payment of utility charges, rent, all alcoholic beverage fees for the renewal of the license and all other expenses in connection with the restaurant premises." Moreover, the agreement provides that Eric Anderson was responsible for all repairs and expenses related to the operation of the restaurant. Notably, the Management Agreement does

not address the purchase or sale of the restaurant or restaurant equipment.

The Asset Purchase Agreement, which specifically refers to the Management Agreement, governs the purchase and sale of Fins from appellee to appellant. Paragraph six of the Schedule of Conditions, which was attached to the Asset Purchase Agreement, provides that appellant purchased all equipment

on an "as is" basis without warranty of merchantability of fitness for any particular purpose, however, at the Closing of this sale, all equipment shall be in working condition and shall comply with all applicable codes and regulations, and [appellee], at its sole expense, shall repair or replace any equipment not in said working condition.

Appellee expressly warranted, moreover, "that all outstanding liabilities of the Business would be paid in full either before Closing or with the proceeds of the sale."

We agree with the court and appellee that the court could not properly read the Asset Purchase Agreement and attached Schedule of Conditions without taking into consideration the Management Agreement. *See Shoreham Developers, Inc. v. Randolph Hills, Inc.*, 248 Md. 267, 271–72, 235 A.2d 735 (1967). The two agreements together govern the relationship between the parties, and the Management Agreement specifically refers to the Asset Purchase Agreement. Both agreements, which were executed on the same day, address which party is responsible for the maintenance of and repairs to the equipment in the restaurant.

We disagree with the court and appellee, however, that the two agreements, when read together, create an ambiguity insofar as they concern responsibility for the maintenance and repair of the restaurant and equipment after Eric Anderson began managing the restaurant on June 27, 2005. We conclude, in our independent review of the two agreements, that they are not ambiguous. In both, appellee declared that the restaurant and equipment were in good working order. In the Management Agreement, which governed the relationship between Eric Anderson and appellee before

the closing of the sale of Fins to appellant, appellee represented that there was "sufficient equipment in order to operate or manage the restaurant." In the Asset Purchase Agreement, appellee agreed that the equipment would be in working order at the time of closing. That agreement further provided that appellee, at its sole expense, was responsible for repairing or replacing any equipment not in working condition.

Eric Anderson agreed in the Management Agreement to accept the "premises as is" for the purposes of managing the restaurant, and to maintain and repair the restaurant and equipment while he was managing the restaurant. Eric Anderson's agreement to that term of the Management Agreement does not absolve appellee of its responsibility under the agreement to ensure that the equipment was "sufficient" to operate the restaurant. The Management Agreement does not require appellant to purchase the equipment "as is" and does not govern the purchase of the equipment. The court erred, therefore, in ruling that the "as is" term of the Management Agreement controlled over the express terms of the Asset Purchase Agreement. Appellant's agreement in the Asset Purchase Agreement to purchase the equipment "on an 'as is' basis," without warranty of merchantability of fitness for any "particular purpose," does not relieve appellee of its express warranty in the immediately following clause of the same paragraph that "all equipment shall be in working condition and shall comply with all applicable codes and regulations at the time of closing," and that appellee would "repair or replace, at its sole expense, any equipment not in said working condition." *Cf. Azat v. Farruggio*, 162 Md.App. 539, 557, 875 A.2d 778 (2005) (holding that an "as is, where is" disclaimer in a lease agreement did not operate to nullify the appellant's express warranty to provide marketable title).

The court therefore erred in finding that, under the agreements, appellant was responsible for the repair and replacement of equipment. Under the terms of the Management Agreement, appellee was responsible for any repairs necessary to make the equipment "sufficient" for the operation of the restaurant during appellant's management of the restau-

rant. Moreover, under the terms of the Asset Purchase Agreement, appellee was responsible for the repair and replacement of any equipment not in working condition or not in compliance with applicable codes and regulations at the time of settlement. Appellant, for his part, was responsible for any maintenance and improvement to restaurant equipment after he began managing the restaurant, excluding those improvements that appellee agreed to complete. Appellant would, then, be entitled to withhold from the purchase price the amount paid to make necessary repairs. We must vacate the judgment and remand for the court to determine which of the disputed expenditures were for repairs and, consequently, are appellee's obligation under the terms of the agreements.

## II.

Appellant also challenges the court's determination that gift certificates, which were issued by appellee before June 27, 2005, but redeemed to appellant after that date, did not remain appellee's responsibility. Appellant contends that the court, in disallowing appellant's claims for credit for the gift certificate redemptions at issue, misread paragraph ten of the Schedule of Conditions. That paragraph provides that accounts receivable and payable "accruing to and existing as of close of business June 26, 2005, are and shall remain the sole property of [appellee] and responsibility of [appellee] and are not included as a part of this transaction." All accounts receivable and payable accruing to and existing between June 27, 2005 and closing, or immediately from and after closing, "are and shall remain the sole responsibility of [appellant] and are not included as a part of this transaction."

Appellee responds that the court correctly reasoned that, once appellant assumed responsibility for the restaurant, appellant could not later assign financial responsibility back to appellee. Appellee contends that gifts certificates are neither accounts payable nor accounts receivable, so paragraph ten of the Schedule of Conditions is inapplicable. Appellee further maintains that, because there was no reference to gift certificates in any of the documents reflecting the agreement be-

tween the parties, the court properly disallowed appellant's withholding $5,000.00 from the sales price to account for gift certificates.

■ It is not necessary that we determine whether the disputed gift certificates constitute accounts payable, as appellant contends. In paragraph eleven of the Schedule of Conditions, appellee warranted "that all outstanding liabilities of the Business shall be paid in full either before Closing or with the proceeds of the sale." The gift certificates that appellee issued before appellant took over management of the restaurant are liabilities that, under paragraph eleven, appellee remained obligated to pay. The court therefore erred in determining that the certificates are "the sole responsibility of the buyer."

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**APPELLEE TO PAY THE COSTS.**